UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------X
                        :

CALBERT FAGAN,              :         **MEMORANDUM ORDER**

                 Petitioner,    :          **AND JUDGMENT**

                        :         99 CV 2591 (JBW)

   - against -         :         03 MISC 0066 (JBW)

                        :

ROBERT KUHLMAN,      :

                        :

              Respondent.  :

                        :

----------------------------------------------X

WEINSTEIN, Senior District Judge

     A hearing was set for July 25, 2003, at 2 p.m.  A thorough examination of the record indicates that no hearing is required.  The matter can be decided on the basis of the extensive papers before the court.

     A direct appeal from a conviction in a federal district court might well have led to a reversal based upon the trial court's solution to a hearsay problem.  Nevertheless, this evidence issue does not warrant granting a writ collaterally attacking a state court conviction.  *See* 28 U.S.C. § 2254.

Procedure in State Court

     On direct appeal the Appellate Division affirmed petitioner's conviction for murder in the second degree.  *See People v. Fagan*, 659 N.Y.S.2d 982 (N.Y. App. Div. 2d Dep't 1997).  It found the verdict was not against the weight of evidence and the sentence was not excessive. Other "remaining contentions are either unpreserved for appellate review, without merit, or do not warrant reversal," was the Appellate Division's conclusion.  *Id.* at 983.  It noted that "[t]he



appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus

motion which was to suppress statements he made to the police." *Id.* at 982.

In a sound appellate brief, an attorney for petitioner from the Legal Aid Society had

argued that it was error to deny suppression of petitioner's statement to the police before they

administered his *Miranda* warnings; error to admit testimony that the deceased feared petitioner;

error to admit a knife because it was found on the basis of a search warrant when the warrant was

not timely filed; error because trial counsel failed to pursue the defense of extreme emotional

disturbance; error because guilt was not established by the evidence beyond a reasonable doubt;

and error because the sentence of 25 years to life was harsh and excessive.

In an appendix to the brief petitioner's appellate counsel included a report of a forensic

psychologist concluding in part that "once the confrontation between Mr. Fagan and his wife [the

deceased] took place, his underlying feelings of anger and resentment erupted and he lost the

ability to control his actions and behavior." Appendix to Appellant's brief, Supreme Court,

Appellate Division, Second Department, filed June 4, 1997, at 7. The report had not been

offered at trial, but it was introduced at sentencing. Sentencing Transcript at 6-9.

Sentencing

At the sentence the trial court rejected the motion to set aside the verdict. *See id.* at 9-10.

It did review the psychologist's report for sentencing purposes when it was offered by the

prosecutor who contended that it "was not very favorable to defendant . . . [on] mental deviance

or disorder." *Id.* at 7-8. Defense counsel's objection to its receipt was overruled. The court

noted that:

There had been some discussion about the possibility of the defendants' seeking a [sic] extreme emotional disturbance defense.  However that was not raised to the jury . . .

*Id.* at 8-9.

The essence of the case was stated at the sentencing by the prosecution:

The crime that he committed, and the crime that he was found guilty of, was Intentional Murder.  It was a brutal murder of his estranged wife, the mother of small children.  He stabbed her repeatedly after lying in wait for her in a closet with a knife in his hand. [T]hat, brutal action in and of itself would mandate that this defendant spend 25 years in the state penal facility.

In addition, the court is aware that the defendant has been through the justice system on previous occasions and was in fact on felony probation for arson, felony arson, and weapons charges when this crime occurred.  This gentleman obviously cannot be rehabilitated, and should not be permitted to go free into society again.

*Id.* at 18-19.

Trial defense counsel made a fair argument on sentence without relying on an emotional

defense. *See id.* at 10-17, 20-23.  Petitioner was tendered to the court's mercy, with  little avail.

I do not believe that Mr. Fagan is on probation for both arson and weapons charges.  I believe it's only a weapons charge, not to mitigate that by any stretch of the imagination.  Certainly we shouldn't make it out to be more than it is.

Your Honor, clearly this is a very unfortunate set of circumstances that has taken place.

As the Court is aware, Mr. Fagan has been convicted of Second Degree Murder, Intentional Second Degree Murder, but I believe what the evidence has shown at trial was despite the transaction that took place, Mr. Fagan clearly made an attempt to save the life of the victim, Maxine Fagan.

Mr. Fagan certainly could have taken any other courses of action rather than go directly to the police station requesting an ambulance.

As the Court is aware, as the evidence was submitted to the jury, he in fact did go to the police station.  It is also unfortunate, your Honor, that the presentence report

3

does not portray the [sic], give any evidence as to the pedigree of this individual and demonstrate to the Court this is a man who is, had a frankly an extensive work history during his time in the [sic], has had steady employment and has been able to provide for a wife and two children . . . and does in fact have some redeeming qualities in as much as he is a caring father of his two children.

Obviously, the jury has spoken, and I'm not going to take any further issue with regard to the facts of this case. But I do believe that there are, as I set forth, there are some mitigating considerations that this Court should address when sentencing Mr. Fagan, and although Mr. Fagan did not make a statement to the probation department as I already advised the Court, it should be noted that Mr. Fagan did not do so again on the advice of counsel.

I assure the Court that Mr. Fagan is very remorseful for what happened as he has expressed to me on many occasions, but unfortunately in light of our system of jurisprudence, I advised him not to go any further with the probation department in terms of the statements he should make.

Judge, in light of all that, I know that the Court has no choice but to sentence Mr. Fagan to a lengthy term of incarceration, but what I would do, at this time, I ask that the Court look to the mitigating factors that exist in this matter and sentence Mr. Fagan to something less than the maximum that is being requested by the district attorney.

Thank you.

THE COURT:  Mr. Fagan, anything you wish to state?

THE DEFENDANT:  Yes.  I would like to say I'm sorry for what happened, and what happened wasn't intended to do anything this bad.  I'm sorry for what happened. I would like to say that.

*Id.* 20-23.

The trial court's impression was summarized as follows:

Murder comes in many shapes and sizes.  Some people that are murdered never know what is coming, they just die. This is not one of those cases.

Whatever the motivation was, Mr. Fagan subjected his estranged wife to a brutal slaying.  I can only imagine the abject terror that must have existed in the mind of his estranged wife as she realized she was being slain.  The brutality of the crime is just beyond most human comprehension that this vicious stabbing would go on,

4

and after the knife was broken, to proceed to get another knife to finish the job. It just, it boggles the mind that one human being could engage in such wanton brutality.

Again, I don't understand how a human being could be capable of doing this, but Mr. Fagan did. And our law provides that he can receive 25 years to life as the maximum sentence, and that is the sentence that he will receive from this Court.

Therefore, the defendant will be incarcerated in the state penal facility for a maximum of life incarceration, and a minimum of 25 years.

*Id.* 23-24.

Guilt of the homicide was concededly established beyond a reasonable doubt. The only question was the degree of the crime.

Section 440.10 collateral post-appeal motions were filed. Denials were appealed without relief being granted. *See* the extensive papers on the first and second appeals from petitioner's section 440.10 applications.

Originally brought in the Southern District of New York, the case was transferred to the District Court for the Eastern District of New York. An enlarged file has accumulated.

AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d); *Price v. Vincent*, ___ U.S. ___,

123 S. Ct. 1848, 1852 (2003).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of

a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*,

196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court

may grant the writ if the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than this

Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-

13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the

"unreasonable application" clause, "a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Id.* at 413. "[F]ederal law, as

determined by the Supreme Court, may as much be a generalized standard that must be

followed, as a bright-line rule designed to effectuate such a standard in a particular context."

*Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002). Determination of factual issues made by

a state court "shall be presumed to be correct," and the applicant "shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §

2254(e)(1).

Period of Limitations

Congress has set a one-year period of limitations for the filing of an application for a

writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C.

§ 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the

judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz*, No. 01-2739, 2003 U.S. App. LEXIS 6745, at *22 (2d Cir. 2003); *see also* Sup. Ct. R. 13.

Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998).

"[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz*, 221 F.3d 117, 121 (2d Cir. 2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted . . . ." 28 U.S.C. § 2244(d)(2).

The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson*, 206 F.3d 249, 253 (2d Cir. 2000). *See also Artuz v. Bennett*, 531 U.S. 4, 8 (2000) ("[A]n application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. . . . The question

7

whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

In addition, the term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd* 531 U.S. 4 (2000); *Carey v. Saffold*, 536 U.S. 214 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bertha v. Girdich*, 293 F.3d 577, 579 (2d Cir. 2002).

The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v. United States*, 236 F.3d 122, 128 (2d Cir. 2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits  and not barred procedurally" (quotation omitted)); *Rodriguez v. Artuz*, 990 F. Supp. 275, 283 (S.D.N.Y. 1998) (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).

The Supreme Court held in *Duncan v. Walker* that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within

the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181–82 (2001). *Duncan* reversed a case in this circuit which held to the contrary. *See Walker v. Artuz*, 208 F.3d 357, 361–62 (2000). Although the Supreme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). "Equitable tolling . . . is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001).

The statute of limitations does not bar the instant proceeding.

Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

9

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* at § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).

If a petitioner specifies only certain issues that he deems worthy of review in a letter seeking leave to appeal a conviction to the New York Court of Appeals, he will be deemed to have waived any remaining claims in the original appellate brief. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991).

A claim may be presented for habeas review even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his claim before the state court, relied on pertinent federal cases employing constitutional analysis, relied on state cases employing constitutional analysis in like fact situations, asserted his claims in terms so particular as to call to mind specific rights protected by the constitution, or alleged a pattern of facts well within mainstream of constitutional litigation. *See Daye v. Attorney General*, 696 F.2d 186 (2d Cir. 1982).

There is no reason to return the case at bar to the state courts for exhaustion.

Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000). When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir. 1996).

A state prisoner is not required to seek collateral relief on facts and issues already decided on direct review. *Brown v. Allen*, 344 U.S. 443, 447 (1953).

There is no reason for further state court proceedings in the instant case to decide if there was a procedural bar.

11

Actual Innocence

"[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 729 (2d Cir. 2002).

Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320–21 (quotations omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. *Id.* at 321. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* at 324.

A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned "'not [with] the petitioners' innocence or guilt but solely

12

[with] the question whether their constitutional rights have been preserved.'" *Id.* (quoting

*Moore v. Dempsey*, 261 U.S. 86, 87–88 (1923)); *cf. Jackson v. Virginia*, 443 U.S. 307 (1979)

(habeas court may review an *independent constitutional claim* that the evidence adduced at trial

was insufficient to convict a criminal defendant beyond a reasonable doubt); *Thompson v.*

*Louisville*, 362 U.S. 199 (1960) (reversing conviction of "Shuffling Sam" *on direct review* from

conviction in Louisville's police court where there was no evidence that defendant violated city

ordinances).

 Actual innocence of the killing, as already noted, can not be claimed in the instant case.

## Ineffective Assistance of Counsel

 The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall

enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*,

397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained that in

giving meaning to this requirement we must be guided by its purpose—"to ensure a fair

trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of the adversarial process that

the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466

U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove

both that counsel's representation "fell below an objective standard of reasonableness"

measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different," *id.* at 694. *See also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002).

A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome [...]". *Purdy v. Zeldes*, No. 02-7468, 2003 U.S. App. LEXIS 2053, at *18 (2d Cir. Feb. 6, 2003) (quoting *Strickland*, 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Where counsel fails to make a

reasonable investigation that is reasonably necessary to the defense, a court must conclude that

the decision not to call an expert cannot have been based on strategic considerations and will

thus be subject to review under *Strickland*'s prejudice prong. *See Pavel v. Hollins*, 261 F.3d

210, 223 (2d Cir. 2001) (counsel ineffective in a child sexual abuse case where his failure to call

a medical expert was based on an insufficient investigation); *Lindstadt*, 239 F.3d at 201 (same).

The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of

counsel's significant trial decisions must be justified by a sound strategy—a significant raising

of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze*,

321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess

with confidence whether strategic considerations accounted for . . . counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Each factual claim made in support of an allegation of ineffective assistance of counsel

must be fairly presented to a state court before a federal habeas court may rule upon it. *See

Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (dismissing petition as unexhausted where

petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the

habeas court than were presented to the state court, because "[t]he state courts should have been

given the opportunity to consider all the circumstances and the cumulative effect of all the

claims as a whole" (quotation omitted)).  Where an additional factual claim in support of the

ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not

"fundamentally alter" it, dismissal is not required. *Caballero v. Keane*, 42 F.3d 738, 741 (2d

Cir. 1994).  Each significant factual claim in support of an ineffective assistance allegation

15

premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord*, No. 00 CIV. 5510, 2002 U.S. Dist. LEXIS 19923, at *34–*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

As noted below, there is a claim of inadequacy of counsel, but it lacks sufficient merit.

Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 123 S. Ct. 1029 (2003). Any decisions of the federal district court for which a certificate of appealability is granted will be reviewed *de novo* by the Court of Appeals.

This opinion complies with *Miranda v. Bennett*, 322 F.3d. 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449 U.S. 539, 548 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

Claims of Petitioner

Petitioner's claims are in his words as follows:

> POINT I (A)   It was error for the trial court to deny suppression of appellant's statements to the police resulting from custodial interrogation prior to administering *Miranda* warnings.
>
> POINT I (B)   It was error for the trial court to deny appellant's request for a mistrial after admitting into evidence, over objection, Det. Reilly's testimony that Appellant, after administration of *Miranda* warnings, refused to answer further questions without an attorney present.

16

POINT II      It was error to admit testimony, over objection, that the deceased was afraid of appellant, as the deceased's state of mind was not relevant, the testimony was inadmissible hearsay and violated appellant's constitutional rights.

POINT III      It was error for the trial court to admit into evidence the knife found in the car which was not connected to the crime.

POINT IV      Appellant was not adequately represented by trial counsel because of the failure to pursue the defense of extreme emotional disturbance.

POINT V      The evidence presented  at trial did not establish appellant's guilt beyond a reasonable doubt, and the verdict was against the weight of the evidence.

POINT VI      The sentence of 25 years to life is unduly harsh and excessive and should be modified in the interest of justice.

<u>Rulings on Petitioner's Claims</u>

Respondent's Brief dated July 15, 1999 deals with each claim extensively. That brief is adopted and made a part of this memorandum and order.

<u>POINT I (A)</u>   Petitioner's statements to police.

Prior to the trial there was a *Huntley* hearing.  The prosecution informed the court and defense counsel that the prosecution sought only to introduce petitioner's statements made prior to his invocation of his right to an attorney.

On July 6, 1993 at approximately 12:25 in the afternoon, petitioner came into a local police station through the side door used by police personnel.  Detective Sergeant Reilly inquired: "Can I help you?"  Petitioner responded, "Yes, I need an ambulance."
Hearing Tr. at 26-27; 50.

17

Noticing a small cut on petitioner's hand, Detective Sergeant Reilly asked: "Is the ambulance for you?" Petitioner responded, "No, my girl." Detective Sergeant Reilly then inquired, "Why?" *Id.* at 70.

Petitioner stated: "I stabbed her." Detective Sneider then asked petitioner how many times he stabbed her and petitioner stated, "A couple of times." Detective Sneider asked, "Where?" and petitioner responded by pointing a couple of times to his stomach area.

Detective Sergeant Reilly then asked, "Is she conscious?"; petitioner responded, "No." *Id.* at 27-30; 70. Detective Sergeant Reilly then inquired "What address?", initially getting 28 South 33rd Street, then obtaining a corrected address from petitioner of 33 South 28th Street, Wyandanch. *Id.* at 29. A responding police unit was dispatched to the correct address. *Id.* at 30. An ambulance was also sent.

The police were unaware of any stabbing at the location specified, so Detective Sergeant Reilly directed Detective Sneider to check it out. *Id.* at 30. Detective Sneider confirmed via radio that there was in fact a stabbing victim. *Id.* at 31.

Detective Sergeant Reilly advised Detective Pearsall that petitioner was under arrest at 12:45. Prior to petitioner being arrested, Detective Pearsall asked, "Is anybody else hurt at the house?" Petitioner responded, "No, I rolled around with her and stabbed her twice." *Id.* at 52. Detective Pearsall repeated the question and petitioner stated, "No, I fought with Cynthia. I didn't stab her and she ran away." *Id.* at 52-53; 71. Petitioner had a Jamaican Island accent, but apparently understood and spoke English. *Id.* at 53, 75.

Detective Pearsall advised petitioner from a right's card (marked as People's 1 in evidence) and both petitioner and Detective Pearsall initialed the card after the detective wrote

18

down petitioner's responses to the waivers and the time and date. *Id.* at 56-60. Petitioner waived each of his rights.

Upon hearing his rights a second time, petitioner stated he couldn't afford a lawyer but would like to speak with one. *Id.* at 64-65. Detective Pearsall left petitioner and explained the situation to Detective Sergeant Reilly. Detective Pearsall wrote the date and time and signed the statement form reflecting petitioner's position, and ceased all questioning. *Id.* at 64-65. Petitioner was then handcuffed and taken to the scene of the stabbing. *Id.*

Homicide detectives were notified. *Id.* at 35. Although appearing nervous, petitioner was cooperative. He seemed to appreciate that he was speaking to police officers. No threats or promises were made and he did not request an attorney until Detective Pearsall advised him of his rights. *Id.* at 38.

The hearing court held that all statements taken by Detective Pearsall were inadmissible as having resulted from pre-*Miranda* questioning after arrest. *Id.* at 102. Petitioner's initial statements in the presence of Detective Sergeant Reilly, Detective Pearsall, and Detective Sneider were held admissible. *Id.* at 94, 100. It concluded:

> THE COURT: Obviously, the defendant having initiated this
> confrontation with the police and having volunteered the
> information an ambulance was [needed], the police were duty
> bound to inquire further to determine whether or not there was a
> threat to an individual or public safety, etc. The police not only
> have common but statutory authority to attend render aid and
> assistance to people. The police department proceeded in a proper
> fashion here attempting to inquire from the defendant as to the
> extent of the injuries of the individual, the type of injuries that
> may have been sustained or whether they were life-threatening or
> not, and the location of the victim that was reported to them.
> There is no question until they ascertained what it was that was
> being reported to them, they certainly want to continue to have the

19

defendant advise them. The information that was previously given to them by the defendant certainly required them to pursue it further. I do not believe they transgressed in not having given him his rights until they ascertained the situation he was relating to them. Once they had learned, in fact, there was a victim, it appeared likely the defendant was involved in the interrogation would have been precluded without the advice of waivers. It appears to the Court that the statements that were ascertained from the defendant by the respective law enforcement officials who have testified here prior to his being placed under arrest were not the subject of any unlawful intrusion. The Court finds beyond a reasonable doubt the statements were voluntarily made."

*Id.* at 90-92.

The state trial court pretrial hearing and the evidence at the trial fully dealt with this issue. The findings are conclusive and fully justified by the record. 28 U.S.C. § 2244(c). *See also*, 28 U.S.C. § 2254 ("presumed to be correct"). There is no material or controlling fact which was not considered at the state proceeding. This claim has no merit.

That this finding can not now be challenged successfully is supported by, *e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 1252 (1991) ("great deference"); *Sumner v. Mata*, 449 U.S. 539, 550, 101 S. Ct. 764, 771 (1981) ("burden shall rest upon the applicant to establish by *convincing evidence* that the factual determination of the State court was erroneous") (emphasis in original, citation and quotation omitted); *United States v. Guzman*, 11 F. Supp. 2d 292 (S.D.N.Y. 1998), *aff'd*, 152 F.3d 921 (2d Cir. 1998) (factors to be reviewed in pre-*Miranda* statements); *People v. Centano*, 76 N.Y.2d 837 (N.Y. 1990) (factors in deciding custody status).

POINT I (B)    Reference to refusal to answer questions without an attorney.

20

Detective Reilly's testimony at the trial was crisp and professional. Trial Tr. at 132-163. After sending an ambulance and a detective to the place where petitioner indicated there was a wounded person, *id.* at 138-139, there was a reference to the attorney issue now complained of. The relevant portion of the record of Detective Reilly's testimony at the trial reads as follows:

> Q. Now Lieutenant, did there come a time that Mr. Fagan after he was advised of his Constitutional Rights?
>
> A. Yes. There was.
>
> Q. *And did you or the other detectives continue to speak with Mr. Fagan after he was advised of his Constitutional Rights?*
>
> A. *No. We did not.*
>
> Q. *Why was that?*
>
> MR. TAITZ: *I object to this line of questioning.*
>
> THE COURT: *Sustained as to the form of that question.*
>
> Q. *Lieutenant, there did there come a time when he was advised of his Constitutional Rights, Mr. Fagan?*
>
> MR. TAITZ: *I object. I ask for a side bar.*
>
> THE COURT: *I will permit that. Overruled.*
>
> Q. Excuse me. Did there come a time when Mr. Fagan was advised of his Constitutional Rights and he requested the assistance of an attorney?
>
> A. Yes, sir.
>
> Q. So, in other words, he invoked his right to an attorney?
>
> A. Yes, he did.
>
> Q. All right. After he invoked his right to an attorney, did you or the other detectives continue to talk to him?

A. No.  Questions did not occur.

Q. Is there any particular reason why you and the other First Squad Detectives didn't talk to him?

A. Yes.  Because he requested he wanted -- *he didn't want to speak to us without an attorney.*

Q. *And is that normal procedure for the police department?*

A. *Yes.*

Q. *That once a person invokes his right to an attorney you stop your questioning?*

A. *Yes.*

MR. TAITZ:  *Judge, I object.*

THE COURT:  *Sustained.  The jury will disregard.*

*Id.* at 140-142 (emphasis added).

Though the issue should probably not have been raised, no prejudice resulted from the reference to defendant's ceasing to talk after he was advised of his right to an attorney.  The practice of ceasing questioning was referred to as "normal procedure."  *Id.* at 142.  Every juror was probably aware of the general *Miranda* practice because of T.V. and the movies.  The court told the jury to "disregard."  *Id.*

The trial court adequately and fully protected petitioner's *Miranda* rights as indicated in the discussion of his claim at IA, *supra*.  There is no merit to this claim.

POINT II      Testimony that the deceased was afraid of petitioner.

It would have been better practice to keep out of the trial testimony about fears of petitioner expressed before the killing.

22

Many courts would probably have excluded it, but some would have let it in. *See, e.g.,*
*United States v. Murillo*, 288 F.3d 1126, 1137-1138 (9th Cir. 2002) (deceased was nervous
about her situation and about being with defendant; her statement to this effect in a telephone
conversation was admissible; she had no motive or incentive to lie when she asked her friend if
the people she was with were planning to harm her; admitted under Rule 803(3)); *but see United
States v. Taubman*, 297 F.3d 161, 164-165 (2d Cir. 2002) (statement of memory offered to
prove the fact remembered properly excluded as hearsay). Statements of victims about their
state of mind immediately prior to the crime that appear to be veracious are sometimes admitted.
*See, e.g., United States v. O'Malley*, 796 F.2d 891, 901 n.12 (7th Cir. 1986) (victim of extortion
conspiracy about his belief of who was responsible); *United States v. Grassi*, 783 F.2d 1572,
1577-1578 (11th Cir. 1986). *But see United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993)
(wrong to use defendant's state of mind to prove misconduct). The Court of Appeals for the
Second Circuit is more meticulous than many courts on this subject.

Under Rule 801(a), possibly some would construe the sense of fear surrounding the
deceased as "nonverbal conduct of a person, [not] intended by the person as an assertion," and
used only circumstantially. Fed. R. Evid. 801(a). This seems somewhat unrealistic since the
friend understood it as a "statement" that the deceased's husband's conduct caused the fear.

To many the state of mind exception to show previous acts of the declarant or of another
seems shrouded in mystery. Rigorous application of traditional hearsay analysis would probably
not have supported admission in the instant case under a state of mind exception. *See, e.g.,*
*Shepard v. United States*, 290 U.S. 96, 54 S. Ct. 22 (1933); Margaret A. Berger, et al., Evidence
¶ 803(3)[05] (Nov. 1996); 6 John Henry Wigmore, Wigmore on Evidence § 1714, p. 90 (James

H. Chadbourn rev. 1976); John H. Mansfield, Norman Abrams and Margaret A. Berger, et al.,
Evidence Cases and Materials 659, 659-679 (9th ed. 1997) (domestic homicide exception
proposed after O.J. Simpson case; *Hillmon-Pheaster-Shepard-Annunziato* and related
developments). Yet, the average educated juror in this district could be trusted to know the
statement's appropriate probative force, and a more expansive view of juror capacity in analysis
of hearsay would allow it in evidence. *Cf.* Fed. R. Evid. 807 ("circumstantial guarantees of
trustworthiness").

The declarant was not unavailable as a witness because of "wrongdoing [...] for the
purpose of preventing the witness from attending or testifying." Fed. R. Evid. 804(a). She was
made unavailable for reasons having nothing to do with a prospective role as a witness.
Nevertheless, some judges would conclude, since the petitioner himself caused the extra-judicial
declarant to be unavailable for cross-examination, that there was no real deprivation of the right
of confrontation.

Simply put, when the deceased's friend saw how nervous she was, she inquired of the
cause. The deceased said she was afraid of petitioner. From this response a trier might
conclude that the deceased was accurately and articulately telling the truth about her then state
of mind, and that state of mind was caused by an accurate memory of prior threats by petitioner
actually made and believed to be serious by the deceased. This testimony presented hearsay
dangers since the credibility of the deceased was at issue and needed to be assessed in
evaluating probative force, and she was not present in court to be tested by cross-examination.

Those courts allowing the testimony would conclude (perhaps indefensibly) that the
deceased was under tension and spoke, without thinking, only of her fear; inferentially, she had

24

a memory of threats by petitioner which caused her state of mind -- fear.  This analysis would seek to ignore the hearsay dangers by relying on inference of the trier rather than on the credibility of the extra-judicial declarant.

The matter might make an interesting class room hypothetical, but it had no bearing on the fairness of the trial.  It would have had no effect on the jury in light of all the evidence.  The trial court did attempt to respond to the objection--without help from counsel.

The testimony complained of in its trial setting was as follows by the deceased's friend, Ann Farrier:

Q.  When you went to pick her [the deceased] up how did -- what airport did you pick her up at?

A.  I picked her up at Kennedy Airport.

Q.  Same airport you dropped her off?

A.  Yes.  On the 17th.  Same one.

. . . .

Q.  Ten o'clock is when you met her?

A.  Yeah.  In the night.

. . . .

Q.  Where did you go?

A.  Well, she came by my house at this time.  And when she was coming home, I asked her about going home and she said, don't go to my house, I'm afraid.  So, I drive to my house to take her to my house.

Q.  So, you're telling us you didn't go to her house?

A.  She didn't go to her house.

25

MR. TAITZ:  I object and ask for a brief side bar discussion.

THE COURT:  Overruled.  We'll see you later.

Q.  Where did you go from there?

A.  From the airport to my house.

Q.  To your house?

A.  Right.

Q.  *You didn't take her to her house?*

A.  *No.  Because she says she's afraid.*

MR. TAITZ:  Judge. objection.

THE COURT:  Overruled.

Q.  Now, Mrs. Farrier, when you got to your house did she stay at your house?

A.  Yes.

Q.  She spent the night at your house?

A.  Yes.

Q.  All right.  Now, did there come a time the next day that you did take her to her house?

A.  Right.  Yeah.  I take her the next day.

Q.  Was that July 6th of 1993?

A.  Yes.

Q.  Now, would you describe for me when you took her to her house -- this is the house on South 28th Street?

A.  Yeah.

Q.  How did you get from your house to South 28th Street?

A. I drive my car.

Q. All right.  Now, where was Maxine's car on July 6th?

A. At my house.

. . . .

Q. All right.  And you took your car?

. . . .

A. Yes.

Q. Would you say why it was they took your car?

A. Because she didn't want to drive her car.  *She didn't want her husband to see. She was afraid that's why I have to use my car.*

MR. TAITZ:  *Objection again.*

THE COURT:  *Sustained.*

MR. TAITZ:  Judge.  Your Honor, I ask at this time --

THE COURT:  *Objection sustained.*

Q. Mrs. Farrier, there came a time though you got in your car with Maxine?

A. Yes.

Q. All right.  And don't tell us what the discussion was about.  Did you talk to Maxine about why you took your car?

A. Well --

THE COURT:  *Yes or no, ma'am?*

Q. *Just say yes or no?*

A. No.

27

Q.  Was there a discussion between you and Maxine about whether to take your car or Maxine's car?

A.  My discussion was she wanted me -- [I] take my car.

. . . .

Q.  Did you get out of the car?

A.  No. [I] sit there for a while and she gets out the car and she's looking for me to come in.  And [I] said to her, go ahead.  You know.  Go get what you have to get and come.  So, she goes towards the mailbox to pick up some mail.  She's heading in.  She said, come.  That's the time [I] rolled the window down and said, go ahead in.  Come.  She insisted. [I] wind up my window, lock up the car door, and there [I] follow her.  We went through the front door.

Q.  Now, I will stop you at this point.  How did she get through the front door?

A.  She used a key.

. . . .

Q.  Did it appear to you that nobody was home?

A.  Well -- yes.  I had said, where is your husband?  She say, he's at work. That's what she said.

. . . .

Q.  Can you describe for the jury how Maxine was acting at this point?

A.  Well, she was going in front and she was like this (indicating) and I was coming behind her and I was like this, too (indicating).  And she takes the key because she didn't have a pocketbook, she have just a notebook with the key. And she pushed the key in the door and opened the door.

Q.  When she said she's looking like this (phonetic), what are you talking about.

A.  Like nervous.  She afraid like.

Q.  Can you tell us if you were nervous?

A.  Huh!

28

Q. *Were you nervous?*

A. *Because she said she's afraid of her husband.*

MR. TAITZ: *Judge, I'm going to object at this point.*

THE COURT: Overruled. *The witness can testify to her own state of mind.*

Trial Tr. at 36-43 (emphasis added).

The question of fear of the witness was repeatedly referred to without objection.

A. Yes. By following her -- behind her back. When she put the key in the door, I was looking like this (indicating). You can see the bathroom and you can see the kid's room.

Q. What were you looking for?

A. I afraid. I afraid.

Q. You were looking for a person?

A. Yeah. Because she said she's afraid, so--

Trial Tr. at 44.

This witness actually saw the petitioner's arm with a knife. He had been hiding in a

closet. She immediately ran from the house. Trial Tr. at 45-54.

The friend's statement that she herself was afraid was a reflection of a state of mind that

had no relevance to the killing except as it was predicated on the deceased's revealed state of

mind. Yet, its introduction could have been justified to buttress her testimony about the hand

holding a knife in the closet and to provide a sensible explanation of the whole scene that the

jury could appreciate. It also explained her fleeing from the house, and the resulting possible

delay in her calling for help, thus adding somewhat to her stature as a person who would not

willingly abandon a friend to danger, perhaps painting her as a believable witness.

The weight in the conviction of all this state of mind testimony was comparable to a feather against a trainload of coal – petitioner's bloody appearance and statements at the station house, the witness's seeing an arm with a knife in the closet, and the other evidence of guilt.

In a collateral attack, federal review of a state court conviction is limited to errors of federal constitutional magnitude which deny a criminal defendant the right to a fundamentally fair trial. Evidentiary rulings usually do not rise to a constitutional level challengeable in a federal habeas corpus proceedings without a showing that the rulings infringed on petitioner's specific constitutional rights. If the "error" in the case at bar interfered with petitioner's right of confrontation it was harmless.

The jury might well have believed that the trial court sustained defense counsel's objections to answers by the witness in which the witness asserted that the victim was afraid. Trial Tr. at 37-39. Upon the sustaining of the objection, defense counsel did not seek a curative instruction or request a mistrial. In these circumstances petitioner's present contentions could be considered unpreserved.

The doctrine of preservation requires that an objection be made when the court has the opportunity to correct the error. N.Y. Crim. Proc. Law § 470.15(2); *People v. Autry*, 75 N.Y.2d 835, 839 (N.Y. 1990); *People v. Patterson*, 39 N.Y.2d 288, 295 (N.Y. 1976), aff'd. 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). This rule "encourages all parties to be vigilant in the protection of their substantive rights throughout the course of a litigation." *People v. Udzinski*, 146 A.D.2d 245, 249 (N.Y. App. Div. 2d Dep't 1989), *lv. to app. denied*, 74 N.Y.2d 853 (N.Y. 1989).

Arguably, under New York law any admission of evidence of the victim's state of mind would constitute harmless error. *People v. Maher*, 89 N.Y.2d 456 (N.Y. 1997). In *People v. Maher*, where lengthy testimony on the victim's fear of defendant was permitted by the trial court, the Court of Appeals held:

> Although the victim's statements should not have been admitted into evidence at defendant's trial, we conclude that the error was harmless. Since the only objection made against their introduction was the violation of a rule of evidence, the harmless error standard to be applied is whether there is significant probability that the jury would have acquitted the defendant of intentional murder had the victim's statements not been admitted. (*See People v. Crimmins*, 36 N.Y.2d 230, 242-243; *see also People v. Rice*, 75 N.Y.2d 929, 932).

Here there was, arguably, no mere evidence error but a denial of the right to confrontation. Yet, if the issue was preserved and if the error was of a constitutional dimension, it was harmless.

This claim lacks merit.

POINT III        Admission of the knife found in the car.

Pursuant to petitioner's pretrial *Mapp* motion to suppress the knife found in the search of petitioner's car, the trial court heard testimony from Detective Sergeant Reilly, Hearing Tr. at 5-18, Detective Paul Schreiber, *id.* at 18-27, and Detective James Johnson. *Id.* at 27-37.

Detective Sergeant Reilly, after speaking with petitioner, observed a red Hyundai parked in the adjacent police parking lot. He checked the registration on the vehicle; it was registered to petitioner. *Id.* at 9-11. He told Detective Gail Scharischmidt to secure the car, and to make sure that nobody went near it or touched it. *Id.* at 12-13.

A warrant was issued for the search of the car. Pursuant to the warrant, Detective Schreiber participated in the search of petitioner's automobile at the Suffolk County Crime

31

Laboratory. *Id.* at 19-20. Detective Johnson of the Identification Section found the knife under the driver's side floor mat. *Id.* at 28-32. Detective Schreiber recorded the finding of the knife in both his notes and a report, but the homicide detective who prepared the return on the warrant omitted this information. *Id.* at 26. Detective Schreiber did not review the return. Detective James Johnson personally took the knife from under the driver side floor mat of petitioner's car on July 7, 1993 during the execution of the search warrant. *Id.* at 28-32. Forensic scientist Joe Baldi looked at the knife and Detective Johnson took the knife back to his laboratory to examine it for fingerprints. *Id.* at 33.

The trial court reviewed the search warrant and the original and amended return. It held that the seizure of the knife was pursuant to probable cause and that the absence of a reference to the knife on the original return did not render the knife inadmissible; reports had been made recording the seizure of the knife at the time of the search. *Id.* at 45. The Court denied the defense application to suppress, finding the knife probative and admissible. *Id.* at 47.

The trial court gave petitioner some protection against prejudice respecting knives at a *Sandoval* hearing. It held that the prosecutor would only be permitted to ask petitioner, if he testified, whether he had been convicted of a felony and a misdemeanor. Hearing Tr. at 57. Thus, questioning would not be permitted concerning petitioner's criminal possession of a weapon, a Molotov cocktail conviction; conviction in February 1993 of Assault in the Third Degree for stabbing one Michael Francis in the head and back with a carving knife; conviction of Criminal Trespass in the Third Degree for refusing to leave Susan Francis's home, *id.* at 50; and charges concerning Menacing Susan Francis with a knife (this charge was dismissed in satisfaction of an Assault Third plea). *Id.* at 30, 50.

32

The knife recovered from appellant's car shortly after the murder might have caused the fatal wounds. An expert testified that the knife could have inflicted the wounds found on the victim. There was no prejudice from admitting the knife simply because another knife was recovered in the bedroom where the victim was found. As already suggested, the trial court believed that two knives had been used. *See* Tr. at 23-24. There was no dispute, furthermore, that appellant stabbed his wife to death.

Petitioner's claim that the delay in filing the return should have led to the suppression of the knife is meritless. Ministerial errors, such as the failure to file a return in a timely fashion do not invalidate an otherwise valid warrant. *See, e.g.*, *People v. Morgan*, 162 A.D.2d 723 (N.Y. App. Div. 2d Dep't 1990); *People v. Hernandez*, 131 A.D. 2d 509 (N.Y. App. Div. 2d Dep't, 1987). The knife, properly recovered, was admissible.

POINT IV        Extreme emotional disturbance defense.

The possible defense of extreme emotional response in this case might have been considered by competent trial counsel as absurd. Defense counsel's strategy was to concede that petitioner did the killing. He argued for a lesser degree of homicide, but not that petitioner was emotionally distraught in a legal sense. In summation he developed the ground for conviction of a lesser degree of homicide:

> Frankly, ladies and gentlemen, this – after this trial, this is not a question of who did it, this is not a who done it. We may not know why what happened. But I am not going to sit up here and tell you with a straight face that Calbert Fagan did not cause the death of Maxine Fagan.
>
> However, what I will suggest to you is that Mr. Fagan is not guilty of Murder in the Second Degree, and that is that Mr. Fagan is neither guilty of intentionally trying to kill Maxine Fagan nor is he guilty of trying to kill Maxine Fagan by

33

acting in a depraved indifference to human life. There is no evidence of that. But what there is evidence of is of a man trying to save his wife's life.

Again, I can tell you that there is no evidence in this case as to why what happened happened. There's nothing to show that. The facts are really rather simple.

You heard Miss Farrier take the stand. She saw an arm come out of a closet.

The next thing we know Calbert Fagan is showing up at the police station. And what is he asking for at the police station? The first thing that he asked for at the police station is: Please send a ambulance. Actually, his words, if my recollection is correct is: I need an ambulance. And then the police officer asked him why, and he told him why: Because he had stabbed his wife and then he needed the ambulance to go down to 28th Street in Wyandanch.

. . . . And that's what this case is all about . . . .

We know that there was stuff all over the floor. You saw the videotape, you saw the pictures. There is no question there was an altercation in there.

But the question is as to why and how. We don't know that. And there was no evidence to prove that, to prove any charge towards Murder in the Second Degree . . . .

This was simply, after all was said and done, a man trying to save a life.

There is no question that something terrible took place. But the bottom line is that the evidence does not support the conviction of Murder in the Second Degree.

Trial Tr. at 165-168, 179.

Petitioner was entitled to effective assistance of counsel under both the Federal and State

Constitutions. *See Strickland v. Washington*, 466 U.S. 668 (1984), *reh. denied*, 467 U.S. 1267

(1984); *People v. Baldi*, 54 N.Y.2d 137 (N.Y. 1981); *People v. Aiken*, 45 N.Y.2d 394 (N.Y.

1978). As already noted in the section on AEDPA, supra, the United States Supreme Court in

34

*Strickland v. Washington, supra,* provided a two-pronged test for ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

With respect to the first, or "deficiency" prong, it stated that the "proper standard for attorney performance is that of reasonably effective assistance." *Id.* The Court of Appeals for this circuit had already adopted such a standard. *See Trapnell v. United States,* 725 F.2d 149, 151-155 (2d Cir. 1983). When passing on the adequacy of an attorney's assistance, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland v. Washington,* 466 U.S. at 689.

In applying the second, or "prejudicial" prong, the Court held that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment . . .[and] any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92.

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 695. Thus, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

The Court then turned to the more practical consideration of how the test should be applied by reviewing courts. It enjoined courts to "strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.* at 697.

In the case at bar defense counsel was a strong advocate for petitioner. Counsel conducted two pretrial hearings, appropriately focused on the issue of petitioner's intent, adequately cross-examined the People's witnesses, presented cogent opening and closing remarks, and raised generally appropriate objections. In short, defense counsel did what could be expected of an attorney faced with the damning evidence in the case. Certainly, he might have done better, but no counsel or judge works from a perfect long-thought out script. Some points are almost invariably weak in any trial.

In reviewing claims of ineffective assistance of counsel a court must avoid confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is for this reason that:

> the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes

36

both showings, it cannot be said that the conviction . . . resulted from a
breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Petitioner has made no showing that he stood a chance of acquittal or a reduced level of

homicide had an "Extreme Emotional Disturbance" defense been introduced. The adversarial

process was not undermined.

The overwhelming nature of the evidence of the premeditated killing of his wife by

petitioner, including petitioner's own oral admission, an eyewitness to part of the attack,

recovery of a knife possibly used in the slaying in petitioner's car, the victim's blood on

petitioner's clothes, and the essentially unfavorable defense psychologist report would challenge

the resources of the ablest counsel. In these circumstances, petitioner was afforded effective

counsel.

At sentencing, the prosecutor requested, over defense objection, that the Court mark as a

Court Exhibit the defense expert's report so as to avoid the very claim of ineffectiveness raised

by petitioner both on his direct appeal and in his present petition. Counsel can not be ineffective

for failing to produce an "expert opinion" that would not have established a basis for an

"extreme emotional disturbance." In his report, admitted as an exhibit at the sentencing, Dr.

Klein found: "Clinical evaluation does not indicate the presence of a severe mental or

emotional disorder at this time. There is no history of past mental illness, treatment or

hospitalization for a mental illness"; "I find no indication that the defendant was suffering from

a severe mental disease of disorder at the time of the alleged offense." Sentencing Tr. 7-9.

Under the New York law, the affirmative defense of extreme emotional disturbance, which will reduce the crime of murder in the second degree to manslaughter in the first degree, Penal Law § 125.25(1)(a), requires that the defendant demonstrate, by a preponderance of the evidence: 1) that there exists an objectively reasonable explanation for his state of extreme emotional disturbance; and 2) that, subjectively viewed, defendant in fact acted under the influence of extreme emotional disturbance. *People v. Moye*, 66 N.Y.2d 887, 890, 498 N.Y.S.2d 767, 489 N.E.2d 736 (N.Y. 1985); *People v. Casassa*, 49 N.Y.2d 668, 678, 427 N.Y.S.2d 769, 404 N.E.2d 1310 (N.Y. 1980), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, (1980); *People v. Butts*, 72 N.Y.2d 746, 748, 536 N.Y.S.2d 730, 533 N.E.2d 660 (N.Y. 1988); *People v. White*, 164 A.D.2d 413 (N.Y. App. Div. 1st Dep't 1991).

The evidence and any reasonable conclusions of the jury would not have supported this defense. Petitioner's jeopardy would not have been decreased if it had been relied upon. The strategic decision not to pursue a defense of extreme emotional disturbance was not constitutionally unsound viewed from the standpoint of a reasonably competent trial attorney.

This claim has no merit.

POINT V          Proof beyond a reasonable doubt.

Guilt was supported by the overwhelming evidence already adverted to in this memorandum, supplemented by other evidence at the trial. *See Wright v. West*, 505 U.S. 277, 297, 112 S. Ct. 482 (1991); *United States v. Parker*, 903 F.2d 91, 96-98 (2d Cir. 1990). This claim has no merit.

<u>POINT VI</u>      The punishment was excessive.

The punishment was within the statutory limits.  The trial court adequately explained it. *See* sentencing, *supra*.  This claim has no merit.

CONCLUSION

The only issues that gives pause are two: 1) a possible defense of extreme emotional response and failure of the defense counsel in neglecting to raise it; the psychologist's report referred to above may have lent some possible credence to such a defense; and 2) introduction of evidence through a friend that the friend and the deceased feared the petitioner shortly before the killing.

The court grants a certificate of appealability on the issues of: 1) lack of adequate trial counsel for failure to raise the defense of extreme emotional response, and 2) introduction of hearsay respecting fear by the deceased and fear by a witness, and failure of the court to rule properly and advise the jury on the testimony about those fears, leading to a possible violation of the right of confrontation.

Since no constitutional violation has been shown in pretrial, trial, appeals and post conviction proceedings in the state court, the petition is dismissed.

SO ORDERED.

JACK B. WEINSTEIN
Senior United States District Judge

Dated: Brooklyn, New York
            2003

39